IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KEITH JAMES LANGE, individually and on
behalf of all others similarly situated,

                            Plaintiff,

        vs.

PROFESSIONAL ACCOUNT SERVICES,
INC.,

                            Defendant.

No. 3:19-cv-0150-HRH

O R D E R

Motion for Summary Judgment

Defendant Professional Account Services, Inc. moves for summary judgment.[1]  This motion is opposed by plaintiff Keith James Lange.[2]  Oral argument was not requested and is not deemed necessary.

Facts

Plaintiff was involved in a motor vehicle accident on October 12, 2016.[3]  On that same day, he was treated at Mat-Su Regional Medical Center ("the Hospital") for injuries he

---

[1]Docket No. 28.

[2]Docket No. 30.

[3]Class Action Complaint at 2, ¶ 15, Docket No. 1.

sustained in the accident.[4] Plaintiff was discharged from the Hospital on the same day as the accident, October 12, 2016. The cost of plaintiff's medical treatment was $7,282.84.

Plaintiff was required to sign an "Inpatient/Outpatient Conditions of Admission and Consent to Medical Treatment" form in order to receive treatment at the Hospital.[5] This form contained an "Assignment of Insurance Benefits/Promise to Pay" provision that read:

> I hereby assign and authorize payment directly to the Facility, and to any facility-based physician, all insurance benefits, sick benefits, injury benefits due because of liability to a third-party, or proceeds of all claims resulting from the liability of a third party, payable by any party, organization, et cetera, to or for the patient unless the account for this Facility, outpatient visit or series of outpatient visits is paid in full upon discharge or upon completion of the outpatient series. If eligible for Medicare, I request Medicare services and benefits. I further agree that this assignment will not be withdrawn or voided at any time until the account is paid in full. I understand that I am responsible for any charges not covered by my insurance company.
>
> I understand that I am obligated to pay the account of the Facility in accordance with the regular rates and terms of the Facility. If I fail to make payment when due and the account becomes delinquent or is turned over to a collection agency or an attorney for collection, I agree to pay all collection agency fees, court costs and attorney's fees. I also agree that any patient or guarantor overpayments on the above Facility visit may be applied directly to any delinquent account for which I or my guarantor is legally responsible at the time of the collection of overpayment. I consent for the Facility to appeal on my behalf

---

[4]Id. at 2, ¶ 16.

[5]Inpatient/Outpatient Conditions of Admission and Consent to Medical Treatment form, Exhibit 1, Affidavit of Jennifer Moore, Docket No. 29-1.

any denial for reimbursement, coverage, or payment for services
or care provided to me.[6]

Michael Lynch, a Lien Unit Manager for defendant, avers that "[w]hen the Hospital
treats a patient who has been involved in a motor-vehicle accident, the Hospital transfers the
patient's account to [defendant] for the purposes of [defendant] filing a hospital lien pursuant
to the Alaska hospital lien statute or otherwise coordinating with third-party payers."[7]
Plaintiff's account with the Hospital was transferred to defendant on October 18, 2016, six
days after he was discharged.[8] On January 10, 2017, defendant prepared a Notice of Hospital
Lien, which stated that the amount due for the services plaintiff had been provided at the
Hospital was $7,282.84.[9] Lynch avers that on January 10, 2017, this Notice was sent "to the
Anchorage Recorder's Office and it was entered by the Recorder."[10] Defendant's internal
logging system indicates that the Notice of Hospital Lien was "sent" on January 10, 2017.[11]
The Notice of Lien was recorded on January 30, 2017.[12]

---

[6]Id. at 1.

[7]Declaration of Michael Lynch at 1, ¶¶ 2-3, Docket No. 29-2.

[8]Id. at 1, ¶ 4.

[9]Exhibit 2 at 1, Second Declaration of Michael Lynch, Docket No. 35.

[10]Declaration of Michael Lynch at 1, ¶ 5, Docket No. 29-2.

[11]Exhibit 1 at 2, Second Declaration of Michael Lynch, Docket No. 35.

[12]Exhibit 1 at 1, Declaration of David M. Barshay, Docket No. 33.

In addition to requiring that a notice of lien be filed with the recorder's office, the Alaska hospital lien statute also requires that "a copy of the notice of lien" be served "by registered mail, at the last known address, upon the person alleged to be responsible for causing the injury and from whom damages are claimed, and upon the insurance carrier that has insured against the liability, if the insurance carrier is known." AS 34.35.460(a). Lynch avers that on January 10, 2017, defendant "was not aware of the identity of the tortfeasor or the identity of the tortfeasor's insurance company" and "[a]ccordingly, [defendant] did not send a copy of the Notice of Hospital Lien to the tortfeasor or the tortfeasor's insurance company. . . ."[13]

On January 18, 2017, "[p]laintiff's insurer, USAA, paid [the Hospital] $5,795.24, leaving a balance of $1,487.60."[14]

Lynch avers that on March 6, 2017, defendant "became aware that the tortfeasor's insurance company was purportedly State Farm" and that defendant "attempted to contact State Farm by phone but was unsuccessful in doing so."[15] Lynch avers that by May 3, 2017, defendant was "able to reach State Farm and confirm the proper mailing address for the State Farm representative."[16]

---

[13]Declaration of Michael Lynch at 1-2, ¶ 5, Docket No. 29-2.

[14]Class Action Complaint at 3, ¶ 23, Docket No. 1.

[15]Declaration of Michael Lynch at 2, ¶ 7, Docket No. 29-2.

[16]Id. at 2, ¶ 8.

There is evidence in the record that an updated lien was prepared on May 4, 2017,[17] but the May 4 Notice of Lien itself is not in the record. Although the updated Notice of Lien was purportedly attached to Lynch's second declaration filed in support of defendant's reply, the only Notice of Lien attached to the second declaration is the original January 10 Notice. Lynch does, however, aver that the updated lien was sent "by mail to State Farm, as well as USAA[.]"[18]

On May 24, 2019, plaintiff commenced this action.[19] Plaintiff's complaint contains four counts. In the first count, plaintiff asserts a claim that defendant violated Section 1692e(2)(A) of the Fair Debt Collection Practices Act (FDCPA) by failing to file a modification of the Notice of Lien. In the second count, plaintiff asserts a claim that defendant violated Section 1629e of the FDCPA by failing to mail a copy of the Notice of Lien to State Farm and a claim that defendant violated Section 1629e(10) of the FDCPA by failing to mail a copy of the Notice of Lien to State Farm's insured. In the third count, plaintiff asserts a claim that defendant violated Sections 1692f(1) and 1692f(6)(A) of the FDCPA by maintaining a lien in the amount of $7,282.84. In count four, plaintiff asserts a claim that defendant violated Section 45.50.471 of the Alaska Unfair Trade Practices and

---

[17]Exhibit 1 at 4, Second Declaration of Michael Lynch, Docket No. 35.

[18]Declaration of Michael Lynch at 2, ¶ 8, Docket No. 29-2.

[19]Although plaintiff filed this action as a class action, the time for plaintiff to file a motion to certify a class has expired without plaintiff filing such a motion. See Order from Chambers at 1, Docket No. 27 (setting deadline for class certification motion as January 21, 2020).

Consumer Protection Act (UTPA) by failing to serve a copy of the Notice of Lien on State Farm, by failing to serve a copy of the Notice of Lien on State Farm's insured, by failing to file a modification of the Notice of Lien, and by maintaining a lien in the amount of $7,282.84.

Defendant now moves for summary judgment on all of plaintiff's claims.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

FDCPA claims

"The FDCPA comprehensively regulates the conduct of debt collectors, and is a strict liability statute." Tourgeman v. Collins Financial Services, Inc., 755 F.3d 1109, 1119 (9th Cir. 2014) (citation omitted). "[T]he FDCPA prohibits debt collectors 'from making false or misleading representations and from engaging in various abusive and unfair practices.'" Donohue v. Quick Collect, Inc., 592 F.3d 1027, 1030 (9th Cir. 2010) (quoting Heintz v. Jenkins, 514 U.S. 291, 292 (1995)). Section 1692e of the FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." Section 1692f of the FDCPA provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." "Whether conduct violates §§ 1692e or 1692f requires an objective analysis that takes into account whether 'the least sophisticated debtor would likely be misled by a communication.'" Donohue, 592 F.3d at 1030 (quoting Guerrero v. RJM Acquisitions LLC, 499 F.3d 926, 934 (9th Cir. 2007)).

> There are four elements of a FDCPA cause of action: (1) the plaintiff is a "consumer" under 15 U.S.C. § 1692a(3); (2) the debt arises out of a transaction entered into for personal purposes; (3) the defendant is a 'debt collector' under 15 U.S.C. § 1692a(6); and (4) the defendant violated one of the provisions contained in 15 U.S.C. §§ 1692a–1692o.

Heejoon Chung v. U.S. Bank, N.A., 250 F. Supp. 3d 658, 680 (D. Hawai'i 2017). There is no dispute that plaintiff can establish the first two elements. The dispute here centers on

whether defendant is a debt collector and whether defendant has violated any provisions of the FDCPA.

As for whether defendant is a debt collector, the FDCPA defines a "debt collector" as

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). Defendant admits that it regularly collects or attempts to collect debts asserted to be owed to others.[20]

But, the FDCPA contains "a series of exemptions." De Dios v. Int'l Realty & Investments, 641 F.3d 1071, 1074 (9th Cir. 2011). Of import here, the statute "excludes 'any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person.'" Id. (quoting 15 U.S.C. § 1692a(6)(F)(iii)),

The issue here is whether plaintiff's debt was "in default" at the time defendant obtained it. If it was, then defendant is a debt collector for purposes of the FDCPA. If it was not, then defendant is not a debt collector for purposes of the FDCPA.

"Although the [FDCPA] does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at

---

[20]Amended Answer at 2, ¶ 9, Docket No. 13.

issue." Id. "In other words, '[w]hether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state law.'" Mavris v. RSI Enterprises Inc., 86 F. Supp. 3d 1079, 1084 (D. Ariz. 2015) (quoting De Dios, 641 F.3d at 1074). The Ninth Circuit has noted that the FDCPA's "legislative history is consistent with construing 'in default' to mean a debt that is at least delinquent, and sometimes more than overdue." De Dios, 641 F.3d at 1075 n.3. And, "[t]he Second Circuit has stated that '[i]n applying the FDCPA, courts have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default.'" Echlin v. Dynamic Collectors, Inc., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015) (quoting Alibrandi v. Fin. Outsourcing Servs., Inc., 333 F.3d 82, 86 (2d Cir. 2003)).

Neither party has cited to any Alaska law that defines when a debt is in a default and plaintiff argues that the underlying contract between him and the Hospital provides no light as to whether his debt was in default at the time defendant obtained it. The Assignment of Insurance Benefits/Promise to Pay that plaintiff signed stated that he was "obligated to pay the account of the Facility in accordance with the regular rates and terms of the Facility"[21] but plaintiff points out that defendant did not provide the court with the "terms of the Facility." Without this information, plaintiff argues that there is no way to know if payment

---

[21]Inpatient/Outpatient Conditions of Admission and Consent to Medical Treatment form, Exhibit 1 at 1, Moore Affidavit, Docket No. 29-1.

was due immediately or whether payment of his debt was not yet due when defendant obtained it. Because defendant is moving for summary judgment and bears the burden of showing an absence of material facts in dispute, plaintiff contends that defendant should have provided such information and its failure to do so means that defendant has not met its initial burden on the issue of whether it is a debt collector.

It is for this reason that plaintiff argues that defendant's reliance on Paladino v. California Business Bureau, Inc., Case No. 14-CV-2364 W (MDD), 2015 WL 12532474 (S.D. Cal. Nov. 17, 2015), is misplaced. There, "CBB [was] a California corporation under contract with UCSD Health System ('UCSDHS') to handle the latter's interactions with its patients related to billing." Id. at *1. "Between March 11, 2013, and March 25, 2014, Plaintiff Paladino received nine mailed notices from CBB on behalf of UC San Diego Health System billing him for medical services rendered between December 19, 2012, and June 30, 2013." Id. Paladino brought FDCPA claims against CBB based on these letters and "CBB contend[ed] that it is not a debt collector within the ambit of the FDCPA because Paladino's debt was not in default when CBB obtained it." Id. at *2. The court agreed, based on CBB's contract with the hospital, the nine bills CBB sent to Paladino, and the declaration of "Mr. Sean Escobar," an employee of "an entity called USCB America[.]" Id. at *3. Based on this evidence, the court concluded that no reasonable jury could find that CBB was a debt collector. Id. at *4. The court explained that

> [u]nder the terms of its contract, CBB obtained Paladino's
> information as soon as Paladino's UCSDHS account had a

balance that was not $0—that is, as soon as Paladino had a pending medical charge. The terms of that contract imply that CBB could begin sending bills to Paladino once it received his remaining patient balance after insurance. Each of these bills contained warnings that Paladino's "account [would] be sent to collections" if three such notices went unpaid, warnings that would be needless if the debt were delinquent before Paladino received his first bill. CBB's contract with UCSDHS implies that Paladino's account balance was not to be treated as "bad debt" until after CBB had sent Paladino the three notices discussed above. Indeed, Mr. Escobar's declaration and the attached USCB debt collection notice show that another entity, USCB America, had sole responsibility for handling collections as to delinquent debts that remained unpaid after CBB's billing cycle.

Id. (internal citations omitted). In short, the court found that "[a]s Paladino's debt was current when CBB obtained it, by definition it was not delinquent; thus, it was not in default at that time." Id. The court rejected Paladino's argument "that payment was due immediately when medical services were rendered, and that as a result Paladino's debt was in default upon his first billing." Id. The court explained that "CBB's contract and Paladino's medical bills show[ed that]: (I) CBB obtained Paladino's information as soon as he possessed a patient balance other than $0; and (ii) insurance must pay its share before CBB can bill the patient." Id. Thus, the court found that "[n]o reasonable jury could find a patient medical bill delinquent ab initio, before the hospital even bills the insurance carrier." Id.

Here, plaintiff contends that it is not clear whether his debt to the Hospital was due immediately upon his discharge from the Hospital. Plaintiff suggests that it is possible that

his debt was due once he left the Hospital and thus it was in default at the time defendant obtained it. Plaintiff cites to <u>Mavris</u>, 86 F. Supp. 3d 1079, in support of his argument.

There, Mavris had received treatment on two different dates in December 2012 at a Scottdale hospital. <u>Id.</u> at 1080. Mavris did not pay for her treatment at either visit and did not have insurance. <u>Id.</u> The hospital assigned Mavris' accounts to RSI on January 14, 2013, and January 15, 2013 for collections efforts. <u>Id.</u> The day after referring each account, the hospital sent Mavris a bill for each account. <u>Id.</u> at 1080-81. For the next several months, Mavris received communications from the hospital, which were prepared by RSI, in attempts to collect payment on her two accounts. <u>Id.</u> at 1081. In August and September 2013, the hospital recalled Mavris' accounts from RSI and turned them over to West Management Access. <u>Id.</u> at 1081-82. Mavris brought FDCPA claims against RSI, and RSI argued that it was not a debt collector because Mavris's debt was not in default at the time RSI obtained it. <u>Id.</u> at 1082, 1084. The "parties agree[d] that no contract between Mavris and Scottsdale Healthcare spells out exactly when or under what conditions her debts would go into default" and the court found that "Arizona law does not appear to provide a clear definition of 'in default' or a test for determining when a debtor has defaulted." <u>Id.</u> at 1084. The court observed that some "courts have filled this void by holding that a determination of default turns on the state of mind of the creditor, i.e., whether the creditor considers the debt to be in default or not" while "[o]ther courts have adopted a much more expansive reading, finding that, at least in certain circumstances, default should be interpreted according to its dictionary

definition—namely, [t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." Id. (citations omitted). The court found "[n]either alternative . . . particularly appealing." Id. The court reasoned that the first alternative "would in some cases undermine the FDCPA's stated intent to eliminate abusive debt collection practices by debt collectors[,]" because "[a creditor] could [refer] [a debtor's] account to [a third party] for collection one day and declare[] her account to be in default the next, thereby allowing [the third party] to engage in collection practices that are prohibited by the FDCPA[.]" Id. at 1085 (citation omitted).

Plaintiff argues that this is similar to what may have happened here, that his account was not in default when the Hospital referred it to defendant but that it went into default shortly thereafter, thereby allowing defendant to avoid the mandates of the FDCPA. Plaintiff insists that there is nothing here to suggest that defendant and the Hospital were not acting in concert to avoid the strict liability mandates of the FDCPA.

Plaintiff's reliance on Mavris is misplaced. First of all, plaintiff has not alleged that defendant and the Hospital were attempting to avoid the mandates of the FDCPA when the debt was transferred to defendant. Secondly, in Mavris, "counsel for RSI admitted during oral argument that the purpose of the June and July letters was to 'scare' or 'motivate' Mavris into making prompt payment." Id. at 1089. Here, the undisputed evidence shows that plaintiff's debt was transferred to defendant "for the purposes of [defendant] filing a hospital lien pursuant to the Alaska hospital lien statute or otherwise coordinating with third-party

payers."[22]   There is no evidence that plaintiff's debt was transferred to defendant so that defendant could scare or motivate him into making payment.

Plaintiff is basically arguing that it is possible that his debt went into default the moment he left the Hospital, but such an argument makes no sense in light of the evidence that plaintiff had insurance, the tortfeasor had insurance, and the Hospital never billed him for any of the charges he incurred for treatment. All of these facts indicate that the Hospital would be pursing payment from the insurance companies before it ever looked to plaintiff to pay his debt.  In addition, plaintiff has alleged that he did not even become aware of the lien until the end of 2018 when he began negotiations with State Farm[23] and defendant "never attempted to collect any amounts directly from" plaintiff.[24]   As one court has observed, "[i]t would defy logic, reason, and common sense for a consumer account to be classified as in default when the creditor had never previously sent a bill or otherwise contacted the consumer about the debt, and the consumer had no inkling of the amount, or even the existence of, the debt." Church v. Accretive Health, Inc., Case No. 14-0057-WS-B, 2015 WL 7572338, at *9 (S.D. Ala. Nov. 24, 2015) (quotation marks omitted).

More importantly, while as plaintiff points out, his contract with the Hospital stated that he was "obligated to pay the account of the Facility in accordance with the regular rates

---

[22]Declaration of Michael Lynch at 1, ¶ 3, Docket No. 29-2.

[23]Class Action Complaint at 3, ¶¶ 25, 27, Docket No. 1.

[24]Declaration of Michael Lynch at 2, ¶ 9, Docket No. 29-2.

and terms of the Facility[,]" it also provided that "I understand that I am responsible for any charges not covered by my insurance company."[25]  And, plaintiff assigned any insurance benefits he might receive to the Hospital "unless the account for this Facility . . . is paid in full upon discharge. . . ."[26]  Plaintiff's contract with the Hospital indicates that the Hospital contemplated receiving payment from a third-party payer, in this case plaintiff's insurance company or the tortfeasor's insurance company, before plaintiff's debt would even be considered due.

Viewing the facts in the light most favorable to plaintiff, no reasonable jury could conclude that plaintiff's debt was due or outstanding, much less in default, at the moment he was discharged from the Hospital.  And, no reasonable jury could conclude that the debt had gone into default by the time defendant obtained it six days later.

The facts of this case are similar to those in Hamilton v. Avectus Health Care Solutions, LLC, Case No. 5:13-cv-01967-SGC, 2015 WL 5693610 (N.D. Ala. Sept. 29, 2015).  There, "Hamilton was injured in an accident on June 28, 2013, and received treatment for his injuries at Huntsville Hospital, where he remained until he was discharged on July 3, 2013."  Id. at *2.  "Hamilton's medical bill from Huntsville Hospital totaled $117,581.66.  At the time he was discharged, Hamilton did not have health insurance to help pay his medical bills, and he left Huntsville Hospital without paying his bill."  Id.  "Huntsville

_____

[25]Inpatient/Outpatient Conditions of Admission and Consent to Medical Treatment form, Exhibit 1 at 1, Moore Affidavit, Docket No. 29-1.

[26]Id.

Hospital contracts with Avectus to coordinate payment from third-party payers for treatment provided by the hospital to patients who were injured in accidents." Id. "Huntsville Hospital provides Avectus with a list of accident patients, such as Hamilton, and Avectus contacts those patients to determine if a third-party liability insurer or other third-party payer may be responsible for paying their hospital bills." Id. "Avectus then communicates with third-party payers regarding payment of a patient's Huntsville Hospital bill but does not pursue payments directly from a patient." Id. "Avectus also files hospital liens on behalf of Huntsville Hospital, puts third-party payers on notice of the filed liens, and releases the liens after the hospital has been paid." Id. "On August 2, 2013, Avectus recorded a hospital lien in the Marshall County Probate Office on behalf of Huntsville Hospital." Id. at *3. "The lien stated Huntsville Hospital claimed a lien for $117,581.66, the amount due for Hamilton's treatment at the hospital, and it identified Geico Insurance Co. as the party liable for Hamilton's damages." Id. "Avectus mailed a copy of the lien to Hamilton." Id. On August 26, 2013, Avectus "recorded an amended lien on behalf of Huntsville Hospital[,]" which "added State Farm, Hamilton's insurer, as a party who is liable for Hamilton's damages[.]" Id. "Avectus mailed a copy of the amended lien to Hamilton." Id. In August 2013, Hamilton's hospital bill was paid in full after Hamilton settled with Geico and State Farm. Id. "Avectus then filed a release of the hospital lien on behalf of Huntsville Hospital on October 3, 2013." Id. "Hamilton assert[ed] claims against Avectus under the FDCPA based on his allegations [that] Avectus's actions and communications violated certain provisions

of the FDCPA." Id. at *4. On motion for summary judgment, Avectus argued that it was not a debt collector under the FDCPA. Id. at *8. The court found that Avectus had either obtained Hamilton's debt on July 2 or July 15, 2013 and that at that time, the debt was not "in default." Id. The court explained that

> [t]here is nothing in the record to suggest Huntsville Hospital sent a bill to Hamilton prior to th[e July] dates, much less that any payment was due to the hospital before those dates. Indeed, Hamilton did not come forward with any bill issued to him by Huntsville Hospital. As a result, he cannot show his debt to Huntsville Hospital was in default when his account was referred to Avectus.

Id. The court rejected Hamilton's argument that "his debt to Huntsville Hospital was in default as soon as he left the hospital without paying his bill because 'default' is synonymous with 'outstanding.'" Id. The court rejected this argument because "case law rejects the proposition that default occurs immediately after a debt becomes due." Id. (citation omitted).

Similarly here, there is no evidence that the Hospital sent any bills to plaintiff, much less demanded immediate payment. Plaintiff's bill might have been outstanding at the time he was discharged from the Hospital and he might have agreed that he was responsible for ultimately paying this bill, but there is no evidence that suggests that his debt was in default when he left the Hospital or six days later when defendant obtained it. Based on the undisputed facts, and viewing those facts in the light most favorable to plaintiff, no reasonable jury could conclude that defendant was a debt collector for purposes of the FDCPA.

But even if there is some dispute as to whether defendant is a debt collector, which there is not, defendant would still be entitled to summary judgment on plaintiff's FDCPA claims because the communications at issue here do not fall within the scope of the FDCPA. "Courts have found . . . that 'the [FDCPA] does not apply to every communication between a debt collector and a debtor.'" Hamilton, 2015 WL 5693610, at *4 (quoting Grden v. Leikin Ingber & Winters PC, 643 F.3d 169, 173 (6th Cir. 2011)). "The Ninth Circuit has recognized that communications by a debt collector that do not implicate the FDCPA's purpose are not within the scope of the Act." Roth v. Equifax Information Services, LLC, Case No. 2:16-cv-04325 JWS, 2017 WL 2181758, at *3 (D. Ariz. May 17, 2017) (citing Guerrero, 499 F.3d at 935-39). To fall within the scope of the FDCPA, a communication must "'convey[] information about a debt and its aim [must be] at least in part to induce the debtor to pay[.]'" Hamilton, 2015 WL 5693610, at *4 (quoting Caceres v. McCalla Raymer, LLC, 755 F.3d 1299, 1302 (11th Cir. 2014)).

The communications involved in this case concern the filing of a hospital lien. "[E]very indication is that the purpose of" such communications is "to collect and process information about third-party payer claims" and not to induce the consumer "himself to pay his debt to the hospital." Id. at *7. In fact, as noted above, during the relevant time period, defendant "never attempted to collect any amounts directly from" plaintiff.[27]

---

[27]Declaration of Michael Lynch at 2, ¶ 9, Docket No. 29-2.

Plaintiff, however, argues that because the Notice of Lien was not timely filed, any actions taken by defendant could not be "in the capacity as a lienor (or agent of a lienor)."[28] The Alaska hospital lien statute "requires that a lien be <u>recorded</u> within 90 days after the discharge of the injured person. . . ." <u>Blatchford v. Alaska Native Tribal Health Consortium</u>, Case No. 3:08-cv-00247 TMB, 2009 WL 10678409, at *4 (D. Alaska Sept. 11, 2009) (emphasis added).

Lynch has averred that the Notice of Lien was sent to the Recorder's office on January 10, 2017[29] and defendant's internal log indicates that the Notice was sent on that date.[30] Plaintiff has not offered any evidence that the Notice of Lien was not sent to the Recorder's on January 10, 2017. Thus, it is undisputed that the Notice of Lien was prepared and sent to be recorded on January 10, 2017, which was exactly 90 days after plaintiff's discharge from the Hospital. It is also undisputed that the Notice of Lien was not recorded until January 30, 2017, which means that the Notice of Lien was not timely recorded. While this may mean that the lien that defendant filed on behalf of the Hospital was not perfected or was not enforceable, it does not mean that defendant was not acting as a lienor when it prepared the Notice of Lien and the modified Notice of Lien. That the Notice of Lien was untimely recorded does not change the purpose of defendant's communications in this case.

---

[28]Plaintiff's Memorandum in Opposition [etc.] at 3, Docket No. 32.

[29]Declaration of Michael Lynch at 1, ¶ 5, Docket No. 29-2.

[30]Exhibit 1 at 2, Second Declaration of Michael Lynch, Docket No. 35.

Regardless of whether the Notice of Lien was timely filed, all of the communications at issue in this case related to the filing of a hospital lien and were not for the purpose of inducing plaintiff to pay his debt to the Hospital. As such, defendant's communications do not fall within the scope of the FDCPA and no reasonable jury could find that defendant violated the FDCPA.

Because defendant is not a debt collector and because defendant did not violate any provisions of the FDCPA, plaintiff's FDCPA claims fail. Defendant is entitled to summary judgment on plaintiff's FDCPA claims.

UTPA claim

"[A] prima facie case of unfair or deceptive acts or practices under the UTPA requires proof of two elements: '(1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.'" Kenai Chrysler Center, Inc. v. Denison, 167 P.3d 1240, 1255 (Alaska 2007) (quoting State v. O'Neill Investigations, Inc., 609 P.2d 520, 534 (Alaska 1980)). In determining whether an act is unfair, the court looks at

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or other-wise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers. . . .

<u>Borgen v. A & M Motors, Inc.</u>, 273 P.3d 575, 590 (Alaska 2012) (citation omitted). "[W]hether an act is deceptive is determined simply by asking whether it has the capacity or tendency to deceive." <u>Id.</u> at 591 (citation omitted).

Plaintiff has alleged that defendant violated the UTPA because it did not comply with the Alaska hospital lien statute. More specifically, plaintiff contends that defendant failed to serve a copy of the Notice of Lien on State Farm and State Farm's insured and failed to file a modification of the Notice of Lien and instead continued to maintain a lien in the amount of $7,282.84.

Plaintiff argues that the record is not clear as to when the Notice of Lien was sent to the Recorder's Office and if it were sent after January 18, 2017, the date on which his insurer made payment, then there can be no dispute that the amount on the original Notice was wrong and that an amended Notice should have been filed.

This argument fails. As discussed above, it is undisputed that the Notice of Lien was sent to the Recorder's Office on January 10, 2017. The Notice of Lien was accurate when it was originally sent for recording.

To the extent that plaintiff is contending that defendant violated the UTPA by failing to modify the Notice of Lien, Lynch has averred that the Notice of Lien was modified[31] and a note in defendant's internal log indicates that on May 4, 2017, the lien was "updated."[32]

---

[31]Declaration of Michael Lynch at 2, ¶ 8, Docket No. 29-2.

[32]Exhibit 1 at 4, Second Declaration of Michael Lynch, Docket No. 35.

While it would have been preferable to have the modified Notice of Lien itself in evidence, plaintiff has not offered any evidence to show that the Notice of Lien was not modified as Lynch avers and the log indicates.

Plaintiff next contends that defendant was required to file the Notice of Lien "not later than 90 days after the discharge of the injured person from the hospital[,]" AS 34.35.460, but the evidence shows that defendant did not prepare the Notice until January 10, 2017, which was exactly 90 days after plaintiff's discharge from the Hospital. Plaintiff thus argues that unless the Notice of Lien was hand-delivered to the Recorder's office, it could not have possibly been recorded within the 90 days.

As discussed above, defendant failed to timely file the Notice of Lien but this does not make defendant's conduct as it relates to the original Notice of Lien unfair or deceptive. Viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that untimely filing a notice of lien violated public policy; was "immoral, unethical, oppressive, or unscrupulous;" or caused substantial injury to plaintiff. <u>Borgen</u>, 273 P.3d at 590. In addition, no reasonable jury could conclude that such an act was deceptive, given that the amount listed on the original Notice of Lien was accurate on the date that defendant sent it for recording.

Plaintiff also argues that defendant violated the Alaska hospital lien statute by not sending the Notice of Lien to the tortfeasor and the tortfeasor's insurance company. Although defendant contends that it did not have this information in January 2017, plaintiff

complains that defendant has not explained why it did not have this information or what efforts it made to obtain this information. Plaintiff seems to be suggesting that defendant acted unfairly or deceptively because it did nothing to try to obtain this information, such as requesting a copy of the police report.

This argument fails. The Alaska hospital lien statute requires that the Hospital,

> after the 90-day period, before the date of judgment, settlement, or compromise, serve a copy of the notice of lien by registered mail, at the last known address, upon the person alleged to be responsible for causing the injury and from whom damages are claimed, and upon the insurance carrier that has insured against the liability, if the insurance carrier is known.

AS 34.35.460(a). Nothing in this provision suggests that the Hospital, or an entity acting on its behalf, was required to conduct an investigation or take any particular measures in an attempt to obtain the name and address of the tortfeasor or his insurance carrier.

Because defendant did not violate the Alaska hospital lien statute, plaintiff's UTPA claim fails. Defendant is entitled to summary judgment on plaintiff's UTPA claim.

<u>Conclusion</u>

Defendant's motion for summary judgment is granted. The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 18th day of March, 2020.

/s/ H. Russel Holland
United States District Judge